## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **LYNELLE L. DAVID,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:12C00017 LMB** |
| | ) | |
| **CAROLYN W. COLVIN,[1]** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Lynelle L. David for Disability Insurance Benefits under Title II of the

Social Security Act.  This case has been assigned to the undersigned United States Magistrate

Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See

28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 18).  Defendant

filed a Brief in Support of the Answer.  (Doc. No. 23).

## Procedural History

On September 21, 2010, plaintiff filed her application for Disability Insurance Benefits,

claiming that she became unable to work due to her disabling condition on July 9, 2008.  (Tr.

125).  This claim was denied initially and, following an administrative hearing, plaintiff's claim

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 28, 2011.

(Tr. 70-74, 19-27).  Plaintiff then filed a request for review of the ALJ's decision with the

Appeals Council of the Social Security Administration (SSA), which was denied on January 18,

2012.  (Tr. 1-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

See 20 C.F.R. §§ 404.981, 416.1481.

### Evidence Before the ALJ

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on October 19, 2011.  (Tr. 34).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert Jennifer

Shaddah.  (Id.).

Plaintiff's attorney made an opening statement, in which she indicated that plaintiff was

not diagnosed with multiple sclerosis ("MS")[2] until 2010, although her records indicate that she

was experiencing problems typical of MS since 2007.  (Tr. 36).

The ALJ examined plaintiff, who testified that she was forty-seven years of age.  (Tr. 37).

Plaintiff stated that she was married, and had five children.  (Tr. 38).  Plaintiff testified that only

one of her children, a fifteen-year-old son, was under the age of eighteen.  (Id.).  Plaintiff stated

that her son takes care of himself.  (Id.).  Plaintiff testified that she also lived with her husband,

her daughter, and her daughter's two-month-old child.  (Tr. 39).  Plaintiff stated that she sits

down and holds her grandchild.  (Id.).

---

[2]Common demyelinating disorder of the central nervous system, causing patches of sclerosis (plaques) in the brain and spinal cord; typical symptoms include visual loss, double vision, speech disorder, weakness, paresthesias, and mood alterations.  Stedman's Medical Dictionary, 1733 (28th Ed. 2006).

Plaintiff testified that she has a driver's license and that she drives to Wal-Mart, a five-minute long drive, two to three times a week.  (Id.).  Plaintiff stated that she usually only drives in her town of Moberly, and that she has someone with her if she drives out-of-town.  (Id.).  Plaintiff testified that she and her husband took turns driving to the hearing in Columbia.  (Id.).  Plaintiff stated that she had difficulty remembering how to get to the hearing, and that she had to stop to get directions.  (Tr. 40).

Plaintiff testified that she earned a bachelor's degree in Business Administration/Management at Columbia College in 1996 or 1997.  (Id.).

Plaintiff stated that her husband works.  (Id.).  Plaintiff testified that she does not receive Medicaid benefits, and that she has private health insurance.  (Tr. 41).  Plaintiff stated that she does not receive food stamps.  (Id.).

Plaintiff testified that she has received unemployment compensation sporadically beginning in 2008.  (Id.).  Plaintiff stated that she was receiving unemployment benefits at the time of the hearing.  (Id.).  Plaintiff testified that she has been submitting two job applications a week, which is required to receive unemployment benefits.  (Id.).  Plaintiff stated that she had not received any offers of employment.  (Id.).  Plaintiff testified that she has problems with her memory, which makes interviews difficult.  (Id.).

Plaintiff stated that she tried to return to work after her alleged onset of disability date. (Tr. 42).  Plaintiff testified that she worked part-time at a tanning salon greeting people, making appointments, and taking payment.  (Id.).  Plaintiff stated that she had difficulty cleaning the tanning beds, and that her clients would often clean the beds.  (Tr. 43).  Plaintiff testified that she performed most of this position sitting down.  (Id.).  Plaintiff stated that her employer

accommodated her due to her medical condition, and told her she could go home if she was not feeling well.  (<u>Id.</u>).  Plaintiff testified that this position ended in June or July of 2011.  (<u>Id.</u>). Plaintiff stated that she worked an average of eight to ten hours a week after she was diagnosed with MS, and was paid minimum wage.  (Tr. 44).  The ALJ stated that this position was not substantial gainful activity.  (<u>Id.</u>).

Plaintiff's attorney examined plaintiff, who testified that she stopped working at the tanning salon because she started setting off alarms due to her inability to remember the alarm codes.  (<u>Id.</u>).  Plaintiff stated that she could not remember how to perform other job duties, such as opening the safe, and conducting transactions.  (Tr. 45).  Plaintiff testified that she was also unable to perform physical duties, such as cleaning the tanning beds, and scrubbing the floor. (<u>Id.</u>).

Plaintiff testified that she performed clerical work for the Department of Corrections in 2008.  (<u>Id.</u>).  Plaintiff stated that, beginning in 2007, she started having difficulty remembering how to perform routine job duties and was written up by her supervisors.  (<u>Id.</u>).  Plaintiff testified that she also began experiencing fatigue, and would lie down under her desk during breaks.  (<u>Id.</u>). Plaintiff stated that her co-workers would have to wake her after her lunch break.  (<u>Id.</u>).

Plaintiff testified that she sought medical treatment due to her difficulties at work.  (Tr. 46).  Plaintiff stated that her doctors told her she was having strokes in 2008.  (<u>Id.</u>).  Plaintiff testified that, in July 2012, she "got real bad," and went to the emergency room.  (<u>Id.</u>).  Plaintiff stated that she underwent an MRI, and was diagnosed with MS.  (<u>Id.</u>).  Plaintiff testified that she started seeing doctors in Columbia.  (<u>Id.</u>).

Plaintiff testified that, in 2007 and 2008, she was experiencing symptoms of memory loss,

- 4 -

overwhelming fatigue, problems with her bowels, and balance problems that resulted in falls.  (Tr. 46-47).  Plaintiff stated that she did not tell her doctor about the problems with her bowels because she was too embarrassed.  (Tr. 47).  Plaintiff testified that her sister is a GI nurse and she gave her advice.  (Id.).

Plaintiff stated that she loses her balance every day.  (Id.).  Plaintiff testified that she holds onto the wall and furniture in her home.  (Id.).  Plaintiff stated that she leans on her cart when she goes to Wal-Mart.  (Id.).  Plaintiff testified that she occasionally uses a walker.  (Tr. 48).

Plaintiff stated that she continues to have problems with fatigue, even after starting treatment for her MS.  (Id.).  Plaintiff testified that stress makes her fatigue worse, and she has been under a lot of stress recently.  (Id.).  Plaintiff stated that she sleeps until 12:30 p.m., and still takes naps during the day.  (Id.).  Plaintiff testified that she is only able to be on her feet for about fifteen minutes before she has to sit down.  (Id.).  Plaintiff stated that, on a good day, she can sit for a couple hours before she has to lie down for a couple hours.  (Tr. 49).  Plaintiff testified that on some days, she is unable to get out of her bed due to fatigue and joint pain.  (Id.).  Plaintiff stated that this occurs three to four times a week.  (Id.).

Plaintiff testified that she experiences severe depression in addition to the MS.  (Tr. 50).  Plaintiff stated that she experiences anger and frustration due to her health problems.  (Id.).  Plaintiff testified that she becomes depressed because she is unable to do things she once could do.  (Id.).  Plaintiff stated that, on one occasion, she forgot that her daughter had asked her to watch her granddaughter and she walked out of the room.  (Id.).  Plaintiff testified that she becomes extremely depressed when incidents like this occur.  (Id.).  Plaintiff stated that she experiences crying spells.  (Id.).

Plaintiff testified that, during a typical day, she likes to read, although she has difficulty reading due to her decreased attention span.  (Tr. 51).  Plaintiff stated that she watches television, and holds her granddaughter.  (Id.).  Plaintiff testified that she usually cooks simple meals, and that her son helps her cook.  (Id.).  Plaintiff stated that she used to cook big meals.  (Id.).

The ALJ examined plaintiff, who testified that she has good days and bad days.  (Tr. 52).  Plaintiff stated that she has bad days, during which she is in bed all day, three to four times a week.  (Id.).

The ALJ next examined vocational expert Jennifer Shaddah, who testified that plaintiff's past work was classified as follows: human resources (sedentary, semi-skilled); office support (light, unskilled); office manager (sedentary, skilled); and leasing agent (sedentary, skilled).  (Tr. 54-55).

The ALJ asked Ms. Shaddah to assume a hypothetical claimant with plaintiff's background and the following limitations: sedentary work; simple, routine tasks; low stress job; only occasional decision-making, and occasional changes in the work setting; occasional judgment requirements; and no work in a production pace or pace-type work.  (Tr. 55).  Ms. Shaddah testified that the individual could return to plaintiff's office support position as she performed it (sedentary), but not according to the DOT (light).  (Id.).  Ms. Shaddah stated that the individual could perform other sedentary, unskilled jobs, such as order clerk (255,670 positions nationally, 6,680 in Missouri); stem mounter (193,570 positions nationally, 2,910 positions in Missouri); and stuffer (368,320 positions nationally, 9,190 positions in Missouri).  (Tr. 56).

The ALJ next asked Ms. Shaddah to assume the same limitations as the first hypothetical, with the additional limitation of at least two unscheduled absences per week.  (Id.).  Ms. Shaddah

- 6 -

testified that the individual would be unable to perform plaintiff's past work or any other jobs. (Id.).

The ALJ then asked Ms. Shaddah to assume the limitations from the first hypothetical with the limitation of a need to lie down at least two times each eight-hour work period for two hours each time.  (Tr. 57).  Ms. Shaddah testified that the individual would be unable to perform any jobs.  (Id.).

**B.    Relevant Medical Records**

Plaintiff underwent a CT scan of the brain on August 21, 2007, which revealed abnormalities that could be a small lacunar stroke.[3]  (Tr. 289).  Further evaluation was recommended.  (Id.).

Plaintiff presented to Jon Rampton, D.O. for an emergency room follow-up on August 23, 2007.  (Tr. 411).  It was noted that plaintiff was evaluated in the emergency room two days prior for some dizziness and lightheadedness.  (Id.).  Plaintiff reported that her memory was not as sharp as it used to be, and her balance was off as she trips and falls frequently.  (Id.).  Dr. Rampton recommended an MRI of the brain.  (Id.).

Plaintiff underwent an MRI of the brain on August 27, 2007, which revealed evidence consistent with some microvascular disease.[4]  (Tr. 293).

Plaintiff presented to neurologist Iqbal Khan, M.D., on August 29, 2007.  (Tr. 241-42). Plaintiff reported a recent episode of nausea, with tingling in both hands.  (Tr. 241).  Plaintiff

---

[3]Strokes in which a small branch of a larger blood vessel becomes occluded.  See Stedman's at 1040.

[4]Pathological changes in arterioles and capillaries causing relative ischemia of skin, renal and retinal tissues; characteristic of diabetes mellitus.  See Stedman's at 1211.

complained of fatigue and occasional dizziness. (Id.). Dr. Khan noted that plaintiff had a previous history of numbness on the left side of the body, chronic headache, diarrhea, rash, joint pain, and depression. (Id.). Dr. Khan stated that plaintiff's MRI was abnormal, noting a lucunar stroke. (Tr. 242). Dr. Khan recommended optimizing plaintiff's prevention of further stroke by weight reduction, increasing physical activity, and keeping her blood pressure in control. (Id.).

Plaintiff presented to Dr. Rampton on September 19, 2007, at which time she reported that she experienced an "emotional meltdown" that day. (Tr. 410). Plaintiff indicated that she was having problems at work, and that most of her problems stem from the fact she does not feel like she can do what she used to. (Id.). Dr. Rampton also discussed the possibility that some of her problems could be related to depression, but plaintiff was unwilling to increase her dosage of Zoloft.[5] (Id.). Dr. Rampton diagnosed plaintiff with possible early vascular dementia.[6] (Id.). Dr. Rampton prescribed Aricept.[7] (Id.).

Plaintiff underwent a sleep study on March 20, 2008, which revealed obstructive sleep apnea.[8] (Tr. 265).

Plaintiff saw Dr. Rampton on June 5, 2008, at which time she reported feeling dizzy with

_____

[5]Zoloft is an antidepressant indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited August 2, 2013).

[6]A steplike deterioration in intellectual functions with focal neurologic signs, as the result of multiple infarctions of the cerebral hemispheres. Stedman's at 508.

[7]Aricept is indicated for the treatment of dementia. See Physician's Desk Reference ("PDR"), 1065 (63rd Ed. 2009).

[8]A disorder characterized by recurrent interruptions of breathing during sleep, due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues, with resultant hypoxemia and chronic lethargy. See Stedman's at 119.

vertigo.  (Tr. 409).  Plaintiff also reported swelling in her legs.  (Id.).  Dr. Rampton diagnosed

plaintiff with dizziness and edema.  (Id.).  Dr. Rampton prescribed Meclizine[9] for the dizziness.

(Id.).

      Plaintiff underwent an MRI of the brain on July 8, 2010, which revealed areas of white

matter signaling an abnormality.  (Tr. 297).  Differential diagnosis would include vascular etiology

versus possibly a demyelinating[10] process.  (Id.).

      Plaintiff saw Agara S. Reddy, M.D. for a psychiatric evaluation on August 12, 2010.  (Tr.

245-47).  Plaintiff reported feeling "terribly depressed," and "extremely emotional."  (Tr. 245).

Plaintiff indicated that she was increasingly more depressed, sad, emotional, irritable, impatient,

agitated, argumentative, and sad most of the time.  (Id.).  Plaintiff's husband indicated that

plaintiff was sleeping a lot, neglecting her self-care, and did not want to have any social

interaction.  (Id.).  Plaintiff had been treated for depression and anxiety in the past, and took

Zoloft until recently, when she was switched to Pristiq.[11]  (Id.).  Upon mental status examination,

plaintiff showed a moderate to severe amount of anxiety; she was tearful and sad; her mood was

moderately depressed; no evidence of any suicidal thoughts was noted; and plaintiff's judgment

and insight were intact.  (Tr. 246).  Dr. Reddy diagnosed plaintiff with rule out bipolar II

---

[9]Meclizine is indicated for the treatment of nausea, vomiting, and dizziness.  See PDR at
1898.

[10]Disease of the nervous system in which the myelin sheath of neurons is damaged.  See
Stedman's at 509.

[11]Pristiq is indicated for the treatment of major depressive disorder.  See PDR at 3247.

disorder,[12] most recent episode depressive phase; rule out major depression,[13] recurrent; rule out anxiety disorder NOS; and a current GAF score of 65.[14] (Id.). Dr. Reddy continued plaintiff's Pristiq, and started a trial of Abilify.[15] (Id.).

Plaintiff presented to Myles Goble, M.D. for a neurology consult on August 18, 2010. (Tr. 356-59). Dr. Goble noted that plaintiff had experienced an episode in 2007 involving symptoms of numbness in the feet, and tingling in both arms. (Id.). Plaintiff reported significant progression of severe depression for the past few months. (Id.). Plaintiff indicated that she was having significant difficulty thinking and feels like she is walking around in a fog. (Id.). Plaintiff also reported episodes of double vision intermittently, significant poor sleep, poor balance, uncontrollable loose stool, and occasional tingling in the bilateral upper extremities. (Id.). Dr. Goble stated that plaintiff has had a significant decline in her cognition that he saw mostly as deficits in concentration and attention in the past several years. (Tr. 358). Dr. Goble stated that plaintiff has had multiple episodes of strange neurologic problems that have been written off as a small stroke, but he was worried about evidence on the MRI suggestive of demyelination. (Id.).

---

[12]An affective disorder characterized by the occurrence of alternating hypomanic and major depressive episodes. Stedman's at 568.

[13]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[14]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[15]Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder, major depressive disorder, and schizophrenia. See PDR at 881.

Dr. Goble recommended a work-up for demyelinating disease (i.e. MS).  (Id.).

Plaintiff underwent an MRI of the brain on August 26, 2010, which revealed findings that may represent demyelinating, ischemic, or inflammatory lesions.  (Tr. 353).

Plaintiff presented to Dr. Goble on September 2, 2010.  (Tr. 345).  Dr. Goble noted that plaintiff had had an episode in the past consisting of considerable paresthesias in bilateral arms and legs, right greater than left.  (Tr. 346).  Over the past few months, plaintiff had had significant difficulty thinking, feeling as though she is walking around in a fog; intermittent episodes of double vision with poor balance; and upper extremity tingling.  (Id.).  Dr. Goble stated that while none of these episodes in and of themselves were convincing for a diagnosis of MS, given ancillary testing, the case could be made that these represent two different episodes or dissemination in time/space of MS.  (Id.).  Dr. Goble concluded that plaintiff's clinical picture along with ancillary studies highly suggest the diagnosis of MS.  (Id.).  Dr. Goble referred plaintiff to Dr. Joel Shenker for formal cognitive analysis and started plaintiff on Copaxone[16] treatment. (Tr. 347).

Plaintiff presented to Dr. Joel Shenker for a cognitive evaluation on September 16, 2010, at which time plaintiff reported mild to moderately severe memory problems of several years' duration.  (Tr. 348).  Plaintiff also reported fatigue during the day and mood difficulties.  (Id.). Dr. Shenker found that, based on plaintiff's clinical presentation and the results of psychometric testing, it was very clear that plaintiff's memory complaints are due to the effects of fatigue and depression.  (Tr. 349).  Dr. Shenker stated that plaintiff's daytime fatigue was likely due to

---

[16]Copaxone is indicated for the treatment of Relapsing-Remitting Multiple Sclerosis.  See PDR at 3110.

multifactorial issues including the effects of MS, sleep apnea, and depression.  (Id.).  Dr. Shenker

recommended more aggressive treatment of plaintiff's depression, and medication management of

plaintiff's MS.  (Id.).

Plaintiff presented to neurologist Sudhir Batchu, M.D., on October 15, 2011, for a second

opinion regarding MS.  (Tr. 473).  Dr. Batchu stated that plaintiff's MS is relapsing and remitting.

(Tr. 474).  Dr. Batchu indicated that plaintiff complained of shaking and horrible pain that

prevented her from doing any of her daily living activities on September 13, 2011.  (Id.).  Plaintiff

complained of depression and memory loss on September 17, 2011.  (Id.).  Dr. Batchu indicated

that he referred plaintiff to a psychiatrist, who increased plaintiff's anti-depressant medication.

(Id.).  Dr. Batchu stated that plaintiff's depression and anxiety also prevent her from daily living

activities and being able to work on a full-time basis.  (Id.).  Dr. Batchu expressed the opinion that

plaintiff's relapsing and remitting MS, memory loss, cognitive impairment, and depression prevent

her from working on a full-time basis.  (Id.).

## C.    Evidence Submitted to the Appeals Council

In a letter dated March 16, 2012, Denise Freidel, D.O., stated that plaintiff began seeing

her in May of 2010, and in review of her prior medical records, it was evident in her opinion that

plaintiff's disability began much earlier.  (Tr. 10).  Dr. Freidel stated that plaintiff had difficulty for

several years prior to July 2010, and she was "painstakingly trying to determine why she

[experienced] such extreme fatigue, memory loss, depression, and issues with her balance

resulting in falls."  (Id.).  Dr. Freidel noted that plaintiff was granted leave under the Family and

Medical Leave Act ("FMLA") in March of 2008 because she was unable to perform the essential

functions of her job.  (Id.).  Dr. Freidel indicated that plaintiff left full-time employment in July of

2008 due to the stress of increasing disciplinary action regarding her work performance.  (Id.).

Dr. Freidel concluded: "I hope this letter will clarify some of the issues regarding the onset date of

[plaintiff's] disease and disability given the history of chronic fatigue, depression and other MS

symptoms in her past."  (Id.).

**The ALJ's Determination**

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act
      through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset
      date (20 CFR 404.1571 et seq.).

3.    Since the alleged onset date of disability, July 9, 2008, the claimant has had the
      following severe impairments: Multiple Sclerosis, fibromyalgia, post effects of a
      stroke, degenerative changes in the lower lumbar spine with mild anterior
      degenerative spurring and mild decreased disc space height throughout the lumbar
      spine, and depression.  (20 CFR 404.1520(c)).

4.    Since the alleged onset of disability, July 9, 2008, the claimant has not had an
      impairment or combination of impairments that meets or medically equals the
      severity of one of the listed impairments in 20 CFR Part 404, Subpart P,
      Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that prior to
      July 1, 2010, the date the claimant became disabled, the claimant had the residual
      functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)
      except the person is limited to simple, routine tasks in a low stress job
      environment defined as only occasional decision making, changes in the work
      setting, and judgment required on the job.  The person is not able to work on jobs
      that require production rate or pace work, such as like assembly line work.

6.    After careful consideration of the entire record, the undersigned finds that
      beginning on July 1, 2010, the claimant has the residual functional capacity to
      perform sedentary work as defined in 20 CFR 404.1567(a) except the person is
      limited to simple, routine tasks in a low stress job environment defined as only
      occasional decision making, changes in the work setting, and judgment required
      on the job.  The person is not able to work on jobs that require production rate or

- 13 -

pace work, such as like assembly line work.  Further, the individual has a medically documented need to lie down 2 times for 2 hours each time during an 8-hour workday.

7.   Prior to July 1, 2010, the claimant was capable of performing past relevant work as a Office support.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

8.   Beginning on July 1, 2010, the claimant's residual functional capacity has prevented the claimant from being able to perform past relevant work (20 CFR 404.1565).

9.   The claimant was a younger individual age 45-49 on July 1, 2010, the established disability onset date (20 CFR 404.1563).

10.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

11.   The claimant may have work skills that are transferable to other occupations within the residual functional capacity defined above (20 CFR 404.1568).

12.   Since July 1, 2010, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

13.   The claimant was not disabled prior to July 1, 2010, (20 CFR 404.1520(f)) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g)).

(Tr. 21-27).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on September 14, 2010, the claimant has been disabled under sections 216(I) and 223(d) of the Social Security Act beginning on July 1, 2010.

(Tr. 27).

**Discussion**

**A.**      **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  Id.

**B.**      **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has

the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598,

- 15 -

601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of

- 16 -

whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.    Plaintiff's Claim**

Plaintiff argues that the ALJ erred in evaluating the medical opinion evidence when

determining plaintiff's RFC.  Specifically, plaintiff contends that there is no basis for discounting

the explanation of plaintiff's treating physician concerning the onset of plaintiff's disability.

The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that prior to
> July 1, 2010, the date the claimant became disabled, the claimant had the residual
> functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)
> except the person is limited to simple, routine tasks in a low stress job
> environment defined as only occasional decision making, changes in the work
> setting, and judgment required on the job.  The person is not able to work on jobs  that
> require production rate or pace work, such as like assembly line work.

(Tr. 22-23).

 RFC is what a claimant can do despite her limitations, and it must be determined on the

basis of all relevant evidence, including medical records, physician's opinions, and claimant's

description of her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although

the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant

evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th

Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is

required to consider at least some supporting evidence from a medical professional.  See Lauer,

245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC);

- 18 -

Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff contends that the ALJ formed his own opinion regarding the onset of plaintiff's disability rather than relying on the opinion of plaintiff's treating physician, Dr. Freidel. Defendant argues that the ALJ did not see Dr. Freidel's opinion because it was submitted after the ALJ's decision. Defendant further argues that the medical evidence does not support Dr. Freidel's opinions.

In a letter dated March 16, 2012, Dr. Freidel expressed the opinion that plaintiff's disability began much earlier than May of 2010. (Tr. 10). Dr. Freidel's letter was authored after the ALJ rendered his decision. Plaintiff submitted the letter to the Appeals Council. (Id.).

After the Appeals Council has considered newly submitted evidence, the reviewing federal court determines whether the ALJ's decision was supported by substantial evidence on the record as a whole. Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). This review includes consideration of the new evidence, submitted after the ALJ's decision. Id. See also Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) ("[When] the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."). As a result, the federal court must, to some extent, engage in the "peculiar task" of speculating as to how the ALJ "would have weighed the newly submitted reports if they had been available for the original hearing." Riley, 18 F.3d at 622.

In this case, after considering Dr. Freidel's letter, the ALJ's determination regarding the onset of plaintiff's disability is not supported by substantial evidence. There is no other opinion evidence in the record regarding the period from plaintiff's alleged onset date of July 9, 2008 through July 1, 2010, the date the ALJ found plaintiff was disabled. Dr. Freidel cites evidence in support of her opinion. Dr. Freidel clarifies that for several years prior to July 2010, plaintiff was "painstakingly trying to determine why she [experienced] such extreme fatigue, memory loss, depression, and issues with her balance resulting in falls." (Tr. 10). The record supports this statement.

Plaintiff complained of dizziness, lightheadedness, memory loss, and balance problems in August 2007. (Tr. 411). Plaintiff underwent an MRI of the brain at that time, which revealed abnormalities thought to be consistent with microvascular disease. (Tr. 293). Later in August 2007, plaintiff presented to neurologist Dr. Khan, with complaints of a recent episode of nausea, with tingling in both hands; fatigue; and dizziness. (Tr. 241). Plaintiff presented to Dr. Rampton in September 2007, with reports of experiencing an "emotional meltdown." (Tr. 410). Plaintiff indicated that she was having problems at work related to the fact she was unable to do things she once was able to do. (Id.). Dr. Rampton diagnosed plaintiff with possible early vascular dementia. (Id.). In June 2008, plaintiff complained of dizziness and vertigo. (Tr. 409).

The opinion of Dr. Freidel, as plaintiff's physician, is entitled to substantial weight provided it is not inconsistent with the record. In this case, the medical record lends support to Dr. Freidel's finding that plaintiff had a history of chronic fatigue, depression, and other MS symptoms prior to July 2010. The ALJ's determination that plaintiff's disability began in July of 2010 was based largely on the fact that plaintiff was not diagnosed with MS until after that date.

- 20 -

At the time the ALJ rendered his decision, no physician had expressed an opinion regarding the onset date of plaintiff's disability.  The undersigned finds that, considering the opinion of Dr. Freidel, the ALJ's determination that plaintiff was not disabled prior to July 1, 2010, is not supported by substantial evidence.

**<u>Conclusion</u>**

In sum, the undersigned finds that the ALJ's determination regarding plaintiff's RFC prior to July 1, 2010 is not supported by substantial evidence in light of the opinion of treating physician Dr. Freidel.  Consequently, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly consider the opinion of Dr. Freidel, and reassess plaintiff's residual functional capacity prior to July 1, 2010 based on the medical evidence of record; and obtain vocational expert testimony to determine whether plaintiff is capable of performing work existing in significant numbers in the national economy with her residual functional capacity.  Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.


Dated this  19th  day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

- 21 -